UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES BROWN | CIVIL ACTION |
| versus | NO. 09-105 |
| CENAC TOWING CO., INC. | SECTION "C" (2) |

## ORDER AND REASONS[1]

Before the Court is a Motion for Summary Judgment on the issue of maintenance and cure filed by Defendant Cenac Towing, Co., Inc ("Cenac") and a Motion for Summary Judgment on the issue of unseaworthiness also filed by Cenac. (Rec. Doc. 62, 71). Plaintiff James Brown ("Brown") opposes the motions. (Rec. Doc. 66, 72). The motions are before the Court on the memoranda, without oral argument. Having considered the memoranda of counsel, the record, and the applicable law, the Motion for Summary Judgment on the issue of maintenance and cure is DENIED and the Motion for Summary Judgment on the issue of unseaworthiness is GRANTED for the following reasons.

I. **Background**

This case arises out of an alleged injury onboard the M/V DUSTIN CENAC ("CENAC") while the vessel was docked at a Valero St. James dock in Norco, Louisiana. On October 27, 2007, at the time of the alleged incident, Brown and another tankerman, Malcolm Westley ("Westley") were in the final stages of loading cargo, using a dock hose, from the Valero dock onto the vessel. (Rec. Doc. 72 at 1). A hydraulic arm was being used to assist the maneuvering of the dock hose and was permanently affixed to the Valero dock. (Rec. Doc. 71-2 at 1). The dock

---

[1] Emily Ross, JD candidate of Tulane University Law School, assisted in preparing this Order.

hoses carry the product from the dock to the vessel. Id. Brown alleges he was injured while disconnecting the loading arm from the barge so that Dale Kliebert ("Kliebert"), the dock operator, could lift it back to the dock. (Rec. Doc. 72). Brown alleges that while he and Westley were completing the disconnection process, Kliebert prematurely and without warning began lifting the loading arm. Brown alleges Kliebert did this without any signal from Brown to do so (as is required) and that Brown was pinned by the loading arm and suffered a back injury as a result.

      The day after the injury, Brown, who lives in Opelousas, Louisiana, went to see his primary care physician at the Houma Urgent Care Clinic. (Rec. Doc. 66 at 2). He was later referred to Dr. Christopher Cenac ("Dr. Cenac"), also located in Houma, Louisiana, for further evaluation of his back problems.[2] Dr. Cenac performed various tests, concluding that Brown had a disc protrusion and radiculopathies. (Rec. Doc. 62-6 at 2). Dr. Cenac then prescribed pain medication as well as a course of physical therapy to Brown. Brown saw Dr. Cenac approximately four times between December 2007 and October 2008 and attended only some of the physical therapy sessions Dr. Cenac prescribed for him. (Rec. Doc. 62-6 at 7). On or around April 2008, Brown went to see a different doctor closer to his home, Dr. Cobb. (Rec. Doc. 62-12 at 4). Dr. Cobb discovered an annular tear at the L5-S1 level of the lumbar spine and recommended surgery to fix it. (Rec. Doc. 66 at 2). Dr. Cenac recommended that Brown should not have surgery and should receive lumbar epidural steroid injections instead. (Rec. Doc. 62-6). At some point before Dr. Cobb recommended surgery, Brown contends he received an opinion from Dr. Daniel Hodges, who opined that steroid injections would be ineffectual. (Rec. Doc. 66

---

[2] The parties disagree over who initially referred Brown to Dr. Cenac. The defendant contends that Brown's primary care physician referred Brown to Dr. Cenac; Brown contends that the defendant referred him to Dr. Cenac. Neither party offered any evidence to support its position.

at 2).³ Approximately one year later, and against the wishes of the defendant and the recommendation of Dr. Cenac, Brown went through with the surgery on his spine. Brown brings this suit alleging that Cenac has a duty to provide him with maintenance and cure until he has reached maximum medical cure. Cenac was originally paying for Brown's treatment with Dr. Cenac, but has refused to pay for his surgery. Brown also alleged negligence under the Jones Act and unseaworthiness in his original complaint. This Court previously granted summary judgment to Cenac on the issue of negligence under the Jones Act. (Rec. Doc. 61). This order pertains to the remaining two claims of maintenance and cure and unseaworthiness.

II. **Law and Analysis**

*Summary Judgment Standard of Review*

Summary judgment should be granted to the moving party when the pleadings, record, and other memoranda "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. EVID. 56 (c) (2). A genuine issue of material fact exists if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). The facts are viewed in the light most favorable to the party opposing the motion. *Boze v. Branstetter*, 912 F.2d 801, 804 (5th Cir. 1990).

As an initial matter, the party moving for summary judgment has the burden of using the record to prove there is no genuine issue as to any material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the burden shifts to the non-moving party to produce evidence showing that a genuine factual dispute does exist. *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). Consequently, the non-

---

³ Brown alleges Dr. Cobb referred him to Dr. Hodges for lumbar epidural steroid injections; however, Brown offers no additional evidence, other than his memorandum, to support the contention that he received a second opinion.

moving party must put forth competent evidence and specific facts showing a genuine issue for trial and cannot rely on "unsubstantiated assertions" and "conclusory allegations." FED. R. EVID. 56 (e) (2); *Hancock v. Diamond Offshore Drilling, Inc.*, 2008 WL 3501015, at *1-2 (E.D.La. Aug. 8, 2008).

*Maintenance and Cure*

Maintenance and cure derives from maritime law and is a contractual form of compensation given to a seaman who gets injured or falls ill during his or her service on a vessel. *McCorpen v. Central Gulf Steamship Corp.*, 396 F.2d 547, 548 (5th Cir. 1968). This compensation does not depend in any way on the fault or negligence of the ship owner, but rather is designed as a contractual agreement between employer and employee to provide the seaman with support and medical expenses as a result of his injury or illness aboard the vessel. *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730-731 (1943); *Oswalt v. Williamson Towing Co., Inc.*, 488 F.2d 51, 53 (5th Cir. 1974). However, an injured seaman can forfeit maintenance and cure in certain narrow and well-defined circumstances. *Oswalt*, 488 F.2d at 53. One such circumstance occurs when the seaman unreasonably refuses medical care provided by his employer or abruptly stops a path of treatment already begun. *Id.* Additionally, a seaman can be barred from recovering maintenance and cure if he knowingly or fraudulently concealed a pre-existing injury or illness from his employer during the hiring process. *McCorpen*, 396 F.2d at 548. In its Motion for Summary Judgment on the issue of maintenance and cure, Cenac argues that Brown is barred from recovery of maintenance and cure because he unreasonably refused medical care offered by Cenac and because he willfully and fraudulently concealed a previous back injury from Cenac during the hiring process.

a. *Forfeiture of Maintenance and Cure by Refusing Medical Treatment*

First, Cenac alleges that Brown has forfeited his right to receive maintenance and cure because he refused the medical advice and course of treatment offered by a doctor that was referred to him by his primary care physician. The defendant uses the Fifth Circuit case, *Oswalt v. Williamson Towing Co., Inc.*, to support its argument that the plaintiff unreasonably refused the medical care offered to him. (Rec. Doc. 62-2 at 4). In *Oswalt*, the plaintiff was injured while employed as a deckhand on the defendant's towboat. *Oswalt*, 488 F.2d at 53. The court in that case held that since the plaintiff did not decline medical care, but instead decided to use a different private physician than the private physician that the defendant had referred him to, the "payment of maintenance and cure . . . would comport with the underlying remedial objective," to provide for the "subsistence and medical expenses of a seaman until he has reached the point of maximum possible cure." *Id.* at 54. The court held that the defendant would be liable to pay the plaintiff for maintenance and cure as a result of the plaintiff's choice physician as long as that choice did not result in expenditures that could have been avoided. *Id.* In its reply to the plaintiff's opposition to summary judgment, Cenac correctly points out that the physician that Brown hired recommended a different course of treatment, surgery, which was more expensive than the course of treatment recommended by the physician originally approved by Cenac to treat Brown. However, the court in *Oswalt* was not referring to the different costs of differing courses of treatment; instead it was referring to whether one doctor was more expensive than the other, assuming they recommended the same course of treatment. *Id.* at 54-55. Therefore, the guidance that decision offers is that choosing a separate private physician than the one provided by the plaintiff's employer is not, per se, unreasonable. The facts are a distinguishable here

5

because Brown chose a different course of treatment (and therefore a different doctor) than the course that Dr. Cenac recommended.

Further, the Fifth Circuit has held that it can be reasonable for an employee to choose a course of treatment different from that recommended by the employer's preferred physician. *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1135 (5th Cir. 1981). In *Caulfield v. AC & D Marine, Inc.*, the Fifth Circuit rejected the testimony of a defendant's physician, who had testified that that he did not think the plaintiff required surgery, and held that the defendant was liable to pay maintenance and cure for the employee-plaintiff. *Id.* That case involved facts similar to the situation presented here. In that case, a pilot injured himself onboard his employer's vessel, after which he was permitted to seek care from any private physician he wanted, but because the employee had no primary care physician, his employer referred him to one. *Id.* at 1130-31. Plaintiff initially saw the physician his employer referred him to but later chose to go to a different physician who recommended surgery to fix an abnormality in his lower back. *Id.* at 1131. The defendant attempted to show that the operation was unnecessary and that therefore it shouldn't be responsible for the added expense of surgery. *Id.* at 1135. The court rejected the defendant's physician's testimony, agreeing with the district court that the "employer did not incur any unnecessary expense as a result of the seaman's decision to seek care" from a different private physician. *Id.*

Additionally, the court in *Oswalt* suggested that the only way maintenance and cure can be forfeited is if the plaintiff chooses a physician that is different than the employer's chosen physician and that choice causes an increase in expenditures that may have otherwise been avoided. However, the parties here disagree over whether Cenac actually referred (and therefore chose) Dr. Cenac, or whether Brown chose him independently. Brown alleges that Cenac

6

referred him to Dr. Cenac and Cenac alleges that Brown's primary care physician referred him. The *Oswalt* court appeared to decide that case assuming the employer referred the employee to the doctor they preferred. If that referral was at least in part the basis for the court's decision, then it presents a weaker argument for Cenac if Cenac did not refer Brown to Dr. Cenac. If Cenac did not make the referral, then the defendant is basing its case for denial of maintenance and cure on its preference for a doctor that Brown initially chose (who prescribed a considerably cheaper course of treatment) over another doctor that Brown later chose, with little justification for Cenac's preference.

In his reply memorandum, Brown states that Dr. Cobb was 100 miles closer to his residence. (Rec. Doc. 66 at 2). Additionally, Dr. Cenac stated in his notes on Brown's visits that Brown came to him for advice and that they discussed the different treatment options, with Brown eventually deciding that surgery was the right way for him to go and Dr. Cenac saying that he had no problem with Brown choosing surgery with someone else, but that he would have to be followed up by that doctor and not Dr. Cenac. (Rec. Doc. 62-6 at 7). The fact that Brown decided that another private physician who was 100 miles closer to him and who prescribed a course of treatment for him that he personally preferred is not, in itself, evidence that Brown's actions were unreasonable. The defendant has not provided any evidence that surgery was a completely unreasonable option for Brown to choose; it offers only the opinion of Dr. Cenac at the very start of Brown's treatment and Brown's reply memorandum suggests that at least one other doctor believed that the Dr. Cenac's course of treatment would not have helped Brown. (Rec. Doc. 62-6 at 2-3).[4]

Cenac also alleges that Brown refused medical treatment when he waited approximately six weeks to do any physical therapy and then did not complete the therapy treatment Dr. Cenac

---

[4] See Footnote 3.

recommended. However, Dr. Cenac states in his notes on Brown's visits that Brown did attend several therapy sessions and then developed an abscess that prevented him from finishing the therapy. (Rec. Doc. 62-6 at 7). The defendant offers no evidence to contradict this claim. The fact that Brown did see Dr. Cenac on several occasions, followed up with him, went to several therapy sessions and even consulted him before going through with surgery, indicates that Brown did not unreasonably refuse medical treatment, but rather that he decided to go a different course.[5] Because a dispute still exists concerning who referred Brown to Dr. Cenac, whether surgery was an unreasonable option, and whether not going to all of the therapy sessions was inappropriate, Cenac has failed to meet its burden of proving that there is no genuine issue as to any material fact concerning its defense that Brown forfeited maintenance and cure by refusing medical treatment.

    b. *Failure to Disclose Pre-Existing Injury Prior to Employment as Bar to Recovery*

The defendant argues, in the alternative, that Brown is barred from recovering maintenance and cure because he willingly and fraudulently failed to disclose the fact that he had a prior back injury on the employment application he was required to fill out when Cenac hired him. (Rec. Doc. 62-2 at 9). In order to bar a plaintiff from receiving maintenance and cure under this theory, the defendant must prove that during a pre-employment interview or physical he intentionally misrepresented or concealed material medical facts, the disclosure of which was plainly desired. *McCorpen*, 396 F.2d at 549. Three elements are required to prove this defense: the plaintiff willfully and intentionally failed to disclose pertinent medical facts, the non-disclosed medical facts were material to the employer's decision to hire the plaintiff, and a

---

[5] Further, the Eastern District of Louisiana has previously found that in a maintenance and cure case, even when a plaintiff-employee fails to keep his medical appointments with one physician, he has not refused to accept medical care if he continues treatment with a different physician. *Parker v. Water Towing Co.*, 1991 WL 13928 (E.D.La. Jan. 28, 1991).

causal link between the pre-existing injury that was concealed and the injury incurred in the course of plaintiff's employment. *Id.*; *Jaunch v. Nautical Services, Inc.*, 470 F.3d 207, 212 (5th Cir. 2006).

In regards to the first prong of this test, Cenac alleges that in the employment application process Brown intentionally concealed the extent of prior back injuries that resulted from a motor vehicle accident and that he concealed the lawsuit he filed and workers compensation he received as a result of that accident. Brown argues that he did, in fact, tell Cenac's physician during his physical that he had been in a motor vehicle accident and had undergone an MRI as a result. Brown further alleges that he did not understand the question of whether he had ever received disability compensation and did not realize that workman's compensation would fall under that category. Additionally, Brown questions whether the receipt of workman's compensation is relevant to the pertinent medical facts of his background. A genuine issue of fact exists as to whether Brown intentionally concealed his back injury because he answered "no" on the employment application, but then orally disclosed the information to the physician during his physical. *See Henry v. Gulf Dumar Marine, Inc.*, 2000 WL 1119115 (E.D.La. Aug. 4, 2000) (holding that summary judgment is inappropriate when an employee filing a suit for maintenance and cure had checked "No" on a form about having prior back injury, but checked "Yes" to questions about receiving workman's compensation giving rise to a genuine issue of fact).

In regards to the second prong of the test, Cenac alleges that the non-disclosed facts were material to its decision to hire Brown. In support of this, Cenac provides the deposition of Dr. Watkins, the physician who performed Brown's physical, who stated that he would have inquired further into Brown's prior accident had he known the extent of his injuries. In his

opposition to the motion for summary judgment, Brown alleges that Cenac has failed provide any evidence of a hiring policy that would have deterred Cenac from hiring Brown had they known the extent of his injuries. Additionally, Brown states that he performed his job well for six years and was therefore physically capable of performing the requirements of the job. In *Jaunch v. Nautical Services, Inc.*, the Fifth Circuit Court of Appeals held that if "a vessel owner would have employed the seaman even had the requested disclosure been made, concealment will not bar the seaman's recovery of maintenance and cure." 470 F.3d at 212. In that case, the court held that because the plaintiff intentionally misrepresented numerous previous back injuries and, had he disclosed them, would have either not been hired or been prevented from being on the ship when the accident at issue took place (one week after hiring), the defendants had met their burden under the *McCorpen* test. *Id.* at 212-13. In this case, Cenac has only alleged that it would have waited to hire Brown until further inquiry was made into Brown's medical history, at which point it might have realized that Brown was released with a clean bill of health and might have hired him anyway. Consequently, the question of whether Cenac would have hired Brown had it known about his prior back injury is a fact question for trial. *See Ruiz v. Plimsoll Marine, Inc.*, 782 F.Supp. 315, 317 (M.D.La 1992).

The third prong is clearly established here. Brown previously injured his back in a motor vehicle accident and he alleges an injury to his back in the case at bar. However, because the defendant has not established at least two prongs of the *McCorpen* test and several issues of material fact exist regarding Brown's recovery of maintenance and cure, summary judgment on that issue is DENIED.

*Unseaworthiness*

The owner of a vessel has a duty to ensure that the ship is reasonably fit for its intended use and this duty of seaworthiness obliges the owner to ensure that that the vessel, gear, appurtenances and operation are reasonably safe. *Drachenberg v. Canal Barge Co., Inc.*, 571 F.2d 912, 918 (5th Cir. 1978). If a seaman aboard a vessel experiences an injury due to the unseaworthiness of the vessel, the ship owner is liable to indemnify him. *Id.* The Supreme Court has repeatedly noted that liability based upon unseaworthiness is completely separate from liability based upon negligence. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498 (1971).[6] For that reason, the Court has emphasized that isolated, personal negligent acts of fellow seamen do not make a ship unseaworthy. *Id.* at 499. Similarly, "instantaneous" unseaworthiness is separate from "connected" unseaworthiness. *Robinson v. Showa Kaiun K.K.*, 451 F.2d 688, 690 (5th Cir. 1971). In other words, singular negligent acts do not render a ship unseaworthy, rather a ship may become unseaworthy if a fellow seaman engaged in a "congeries of negligent acts that are of such a character or that continue for such a length of time that they become related to the status of the vessel." *Id.* Additionally, a vessel may be unseaworthy for any number of reasons, including "[h]er gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *Usner*, 400 U.S. at 499.

In order to constitute an appurtenance of a vessel, a piece of machinery must either be part of the ship's usual gear, stored on board, attached to the ship, or under the control of the ship or crew. *Drachenberg*, 571 F.2d at 919. In *Drachenberg v. Canal Barge Co., Inc.*, the Court

---

[6] The court in *Usner* notes the reason for this distinction is that "unseaworthiness is a condition, and how that condition came into being-whether by negligence or otherwise-is quite irrelevant to the owner's liability for personal injuries resulting from it." *Usner*, 400 U.S. at 498.

of Appeals for the Fifth Circuit held that even though a marine unloading arm was permanently affixed to the dock, and therefore not a part of the ship, it was firmly and physically attached to the vessel during the use which gave rise to the alleged injury, and it was a critical component of the vessel's stated purpose. *Id.* at 920. In this case, the defendant argues that Brown had disconnected the dock hose immediately prior to the accident in order to send it back to the dock and therefore, the machinery used in Brown's alleged injury was not an appurtenance of the vessel. However, the dock hose was necessary to the vessel's purpose of loading cargo onto the ship and had been physically attached to the vessel immediately prior to Brown's alleged injury, without which attachment Brown's alleged injury would not have occurred. (Rec. Doc. 71-2 at 1; 72 at 1). The dock hose was "firmly and physically attached to the vessel *during the use* which gave rise to the claim" and was, therefore, an appurtenance of the vessel and as such is subject to the duty of seaworthiness. *Drachenberg*, 571 F.2d at 920 (emphasis added); (Rec. Doc. 71-7 at 5).

After determining that the machinery used in the alleged injury is an appurtenance of the vessel, and therefore subject to a duty of seaworthiness, the next step is to determine if the dock hose and hydraulic arm were reasonably fit for their intended purpose. *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963) ("things about a ship, whether the hull, the decks, the machinery . . . must be reasonably fit for the purpose for which they are to be used."). The defendant argues, and the plaintiff has acquiesced to and stated in a sworn deposition, that there was nothing wrong with the dock hose or hydraulic arm that was used in the unloading process and that neither pieces of machinery were malfunctioning. (Rec. Doc. 71-4 at 15-16). Therefore, the only argument the plaintiff sets forth is that the crane operator had a history of negligently operating the hydraulic arm. The plaintiff argues that it was strictly the fault of the crane

operator and that this constitutes unseaworthiness because the crane operator's acts were part of a congeries of negligent acts that constitute unseaworthiness. The plaintiff offers no evidence to support his contention that the crane operator's procedure was part of a congeries of negligent acts that rendered the vessel unseaworthy.[7] All Brown presents is an alleged "isolated, personal negligent act" of the crane operator and this is not enough to prove the vessel was unseaworthy. *See Usner*, 400 U.S. at 500.[8]

Cenac has provided evidence to support its argument that there is no genuine issue of material fact as to the issue of unseaworthiness. Namely, Cenac has provided evidence that the machinery was not defective and that the crane operator was not acting negligently and had no recorded history of negligent acts aboard the vessel. (Rec. Doc. 71-8 at 4, 5). Brown offers only unsubstantiated and conclusory statements as to the crane operator's "congeries" of negligent acts. This is not enough to overcome summary judgment, as the non-moving party must set out specific facts and evidence showing a genuine issue for trial and "cannot merely rely on 'unsubstantiated assertions' and 'conclusory allegations.'" *Hancock*, 2008 WL 3501015, at *1-2 (citing *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994)). Cenac's motion for summary judgment on the issue of unseaworthiness is GRANTED.

Accordingly,

---

[7] Brown provides an accident investigation from Robert Borison that states only that the direct cause of Brown's alleged accident was the dock operator's negligence in moving the hose before Brown was ready. This does not provide any additional evidence of the dock operator's "congeries" of negligent acts. (Rec. Doc. 71-7).
[8] Additionally, the crane operator was not a member of the vessel's crew. See Rec. Doc. 61.

IT IS ORDERED that Cenac's Motion for Summary Judgment on Maintenance and Cure is DENIED (Rec. Doc. 62) and its Motion for Summary Judgment on Unseaworthiness is GRANTED. (Rec. Doc. 71).

New Orleans, Louisiana, this 24th day of June, 2010.

HELEN G. BERRIGAN<br>
UNITED STATES DISTRICT JUDGE